**CITY OF McALLEN, Appellant,**

v.

**STATE of Texas, Appellee.**

No. 10879.

Court of Civil Appeals of Texas.

Austin.

July 19, 1961.

Rehearing Denied Aug. 14, 1961.

Strickland, Wilkins, Hall & Mills, Mission, Charles E. Crenshaw, Austin, for appellant.

Will Wilson, Atty. Gen., Luther P. Lollar, Jack N. Price, Asst. Attys. Gen., for appellee.

HUGHES, Justice.

The Legislature authorized the City of McAllen, a municipal corporation, to institute suit against the State of Texas "to recover judgment against the State of Texas for all amounts of money heretofore illegally extracted from and paid by the City of McAllen, Texas, as production taxes under the provisions of Art. 7047b," Vernon's Ann.Civ.St.[1]

Suit, as authorized, has been brought by the City of McAllen, and in a nonjury trial, judgment was rendered for the State.

It is our opinion that the State has not "illegally extracted" from, nor has the City of McAllen paid any production taxes to the State under the provisions of Art. 7047b, V.A.C.S.

It was stipulated that the taxes, for the recovery of which this suit is brought, were paid to the State by Delhi-Taylor Corporation and Mayfair Minerals, Inc.[2]

As background for the execution of the instruments upon which the City relies, and

1. S.C.R. No. 24, Acts 55th Leg., Regular Session, 1957, p. 1513.

2. It was also stipulated that the City of McAllen had reimbursed these companies

which instruments we must interpret, we copy from the pleading of the City:

"Taylor Refining Company and Mayfair Minerals, Inc., during the latter part of 1951 and the early part of 1952, undertook to acquire oil, gas and mineral leases from the respective owners of the minerals in lands situated within the corporate limits of the City of McAllen and also within an area adjacent to the City of McAllen, and solicited the cooperation and assistance of Plaintiff [City] in securing such oil, gas and mineral leases, without the payment of any bonus monies. Said companies also desired to acquire oil, gas and mineral leases from Plaintiff [City] on lands it owned either within or adjacent to the corporate limits of the city. In order to induce the city to lease its lands and to cooperate with the companies in obtaining bonus-free leases from other mineral owners having lands located within or adjacent to the City of McAllen, the said companies offered Plaintiff [City] an interest in the gas lying in and under and which might thereafter be produced from lands lying within the corporate limits of and adjacent to the city upon which it was able to acquire oil, gas and mineral leases. Plaintiff [City] agreed to the proposal of the companies and accepted their offer and such agreement was incorporated in a contract between the companies and the City of McAllen, such contract being entered into by the city on February 1, 1952, * * *."

We now quote the pertinent provisions of the contract of February 1, 1952:

"In consideration of the City's right hereunder to purchase gas for a nominal price, which is practically tantamount to receiving gas free of any cost to it, and in consideration of the City's unconditional right hereunder to assign this agreement or to resell to any party the gas purchased by it hereunder at a substantial monetary profit to the City, City covenants and agrees to forthwith, as Lessor, execute and deliver to Companies, as Lessee, without the payment of any bonus to City, valid oil, gas and mineral leases on terms identical with those contained in lease form submitted by Companies to City, covering all minerals owned by City under lands within the 'McAllen General Area' as defined herein. For the same consideration, City covenants and agrees that it will in good faith continuously cooperate with Companies in assisting Companies to promptly obtain from the respective mineral owners, owning lands within the corporate limits of City, without the payment of any bonus, valid oil, gas and mineral leases, on terms identical with those contained in aforesaid lease form submitted to City, covering all minerals owned by such parties. other than City under lands within the said 'McAllen General Area.' Companies agree that they will accept all such leases tendered and that they will within a reasonable time unitize and pool all such leases so obtained by them insofar as they cover lands within the said 'McAllen General Area' so that the same will be a part of the particular gas operating and production unit covering said area which is identified as Companies' 'McAllen Fieldwide Unit.' Companies recognize that any drilling and production operations conducted by them on leases covering lands within the corporate limits of the City of McAllen will be governed by valid terms

for such payment. In our opinion, this stipulation is incorrect and is refuted by the record. Art. 4411, V.A.C.S., provides: "No admission, agreement or waiver, made by the Attorney General,

in any action or suit in which the State is a party, shall prejudice the rights of the State."

Delhi-Taylor Corporation is the successor of Taylor Refining Co.

of the oil and gas ordinance of the City, either as now existing or as may hereafter be amended.

"III.

"Subject to the terms and conditions hereof, Companies hereby agree to sell and deliver to City during the term hereof a quantity of natural gas owned by Companies and produced from their gas leases and leaseholds in the 'McAllen General Area' in Hidalgo County, Texas, up to but not exceeding ninety million (90,000,000) cubic feet of gas per calendar month, but in no event to exceed four million (4,000,000) cubic feet of gas in any one calendar day. Subject to the provisions of Article XII hereof, *the total price to be paid by City to Companies for all gas sold and delivered hereunder shall be the aggregate of (1) an amount of money equal to all Lessor's and landowner's royalty payable by Companies on the quantity of gas so sold and delivered hereunder, and (2) an amount of money equal to all production, severance, sales, gathering, transmission and other taxes of similar nature, levied and assessed in respect of or applicable to the quantity of gas so sold and delivered hereunder.* (Italics ours.)

"IV.

"City's right to purchase and receive delivery of gas hereunder up to the afore-specified quantity shall be a first and superior call on the daily production of gas from Companies' gas leaseholds in the said 'McAllen General Area' during the term hereof. Nothing contained herein shall limit or impair the right of Companies to produce oil, gas and other minerals from their leases in said area in such daily quantities as they may elect, and their right to currently use and sell the same to other parties, or to contract the same for long term de-liveries, so long as such use and sale by or to other parties is subordinate to the prior right of the City from day to day to purchase and receive hereunder gas up to the aforestated maximum daily and monthly quantities.

\*  \*  \*  \*  \*  \*

"City assumes all responsibility and liability for damages caused by property and equipment owned by it; and agrees to odorize all gas delivered to it hereunder in such manner as to comply with all legal requirements with reference to the odorization of gas. City shall have no responsibility or liability for anything that may happen or arise with respect to the gas sold to it hereunder prior to delivery to it at the point of delivery herein specified; and Companies shall have no responsibility or liability for anything that may happen or arise with respect to the gas sold by it hereunder after delivery of the gas to the City at the point of delivery herein specified.

"X.

"Companies hereby expressly reserve unto themselves the right to operate their properties, leaseholds and cycling plant free from any controls by City in such manner as Companies may deem advisable, including the right to determine the rate of production of all their wells, when and where any additional well will be drilled, or when and whether any well will be reworked, abandoned, or utilized for input purposes, or when or whether any lease or unit or well has ceased to produce gas in paying quantities and is to be released or abandoned. Companies hereby expressly reserve unto themselves the right to process the gas produced from the 'McAllen General Area' before delivery to City for the recovery of liquefiable hydrocarbon contained in or produced with said gas, provided such processing will not

render the gas incapable of having a total heating value of at least nine hundred fifty (950) British thermal units per cubic foot at the time of delivery hereunder. Companies shall have the right at any time to enrich gas to the extent required to enable the gas at the time of delivery to meet a total heating value of nine hundred fifty (950) British thermal units per cubic foot.

\* \* \* \* \* \*

"XII.

"As, if and when any well is drilled the surface location of which is on any land which is included within the 'McAllen General Area' and which is within the corporate limits of the City of McAllen, by a party other than Companies, or either of them, or their successors, or the assignee of a substantial portion of their assets, or any one in association with or having a common interest with companies, and gas is produced therefrom in commercial quantities, then and in that event (in lieu of the consideration expressed in Article III hereof to be paid by City to Companies for gas delivered hereunder) City shall pay to Companies for all gas thereafter delivered hereunder (1) the price of ten cents (10¢) per one thousand (1,000) cubic feet of gas, or (2) the then current market price per one thousand (1,000) cubic feet of gas in the 'McAllen General Area,' whichever (1) or (2) shall be the higher."

The City had no facilities for storing the gas which it was entitled to receive under this contract, and had use for only a small portion of it.

On the same date as the contract above described was executed, the City entered into a gas sales contract with the Taylor

Refining Company whereby it sold practically all of the gas it received under the first mentioned contract for 10¢ per m. c. f.

This contract, in part, provided:

"City shall have no responsibility or liability for anything that may happen or arise with respect to the gas during the fragment of the moment that such gas is by this agreement construed as being in its possession; and shall have no responsibility or liability for anything that may happen or arise with respect to the gas after delivery thereof to Buyer hereunder."

Under its contractual obligation to "continuously cooperate" with Delhi and Mayfair in obtaining mineral leases from landowners within the corporate limits of McAllen, without the payment of any bonus, the City succeeded in procuring leases on about 99% of the area within the City for such companies.[3]

The City, honoring its contractual obligation to lease its land to Delhi and Mayfair without bonus but retaining its royalty, leased about eighty acres to the City.

Since the inception of the contract of February 1, 1952, the City has received from the sale of the gas received under such contract approximately the net sum of $8,000 per month. We will give the breakdown of the value of the gas received for the month of February, 1952. The total value of $9,000 is constant for each month since February, 1952, the other amounts have varied only a few dollars in the succeeding months.

| Month | Royalty | Tax | Net | Total |
|---|---|---|---|---|
| February, 1952 | $646.00 | $313.54 | $8,040.46 | $9,000.00 |

We assume the validity of the contract of February 1, 1952.

The true consideration for this contract is vaguely revealed in that portion of the agreement, copied above, which provides

---

3. This phenomenal success is unexplained in the record. The City aided in procuring 2,236 oil and gas leases covering about 6,754 acres of land.

that in lieu of the cooperation to be furnished by the City, the City shall pay 10¢ per m. c. f. for the gas received if anyone other than the Companies drills for and produces gas within the corporate limits of McAllen.

Since the City has contracted to sell this gas for the same price as it would have to pay for it under such circumstance, the City would lose its $8,000 per month income if this contingency occurred.

■ Certainly, we may, without resorting to extrinsic evidence take notice of the interest which the City has in not permitting any other person to drill for and produce gas within the City of McAllen, as well as the means the City has for protecting its interest.

■ We are certain that the lease from the City on 80 acres, and from which the City receives the same royalty as other lessors, was not the real consideration for the $8,000 per month payment.

The "continuing cooperation" of the City is the key to the generosity of the Companies.

Whether we consider this payment in gas as a gratuity or as a valuable consideration for a valid contract, the result here is the same. Its amount is "after taxes."

When the City and the Companies sat down to decide how much the City was to receive for its "continuing cooperation," it was decided that 90 million cubic feet of gas per month subject to the payment of taxes and royalty due on such gas was sufficient.

It is true that the contract states that these sums shall be "the total price to be paid by the City to Companies for all gas sold and delivered hereunder."

This language is unrealistic and is not in keeping with the prior statement in the contract that the City had the right to purchase the gas for a "nominal price, which is tantamount to receiving gas free of any cost to it."

The City simply realized less than it would have received but for the provision as to taxes and royalty. Just so, it would have received less if the contract had provided for 10 million cubic feet of gas per month instead of 90 million cubic feet of gas per month.

To hold that under this contract the City of McAllen has paid the taxes for the recovery of which it was authorized to sue and has sued, or has reimbursed the Companies for such payment, would be too fanciful to be acceptable by any reasonable person.

The taxes involved in this case have been paid without protest by the Companies which produced the gas on which the taxes were levied. Appellant has not reimbursed these Companies for the payment of such taxes, and is not, in our opinion, contractually obligated to do so.

The suit which appellant was authorized to bring against the State has not been proved.

We affirm the judgment of the trial court.

Affirmed.